1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DHARMINDER MANN,

          Plaintiff,

   v.

SARA GULLICKSON,

          Defendant.

_____

AND CROSS-ACTION

Case No.  15-cv-03630-MEJ

**ORDER DENYING MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. No. 36

## INTRODUCTION

At its core, this case consists of a simple breach of contract claim.  But to decide whether the parties' business agreement is enforceable, the Court must navigate the conflict created by the prohibition of medical marijuana under federal law and the legalization medical marijuana under California law.  Specifically, this Order addresses whether Defendant and Cross-Claimant Sara Gullickson is excused from performing her obligations under a contract formed in California because the contract relates to the medical marijuana industry.  Pending before the Court is Gullickson's Motion for Summary Judgment, in which she asks the Court to invalidate the parties' agreement under the federal Controlled Substances Act, 21 U.S.C. §§ 801 et seq.  Mot., Dkt. No. 36.  Plaintiff and Cross-Defendant Dharminder Mann filed an Opposition (Opp'n, Dkt. No. 37), and Gullickson filed a Reply (Reply, Dkt. No. 38).  The Court held a hearing on the matter on September 1, 2016 (Dkt. No. 41) and then ordered Supplemental Briefing (Dkt. No. 42).  Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **DENIES** Gullickson's Motion for the following reasons.

# BACKGROUND[1]

Around March 2014, Mann sold two businesses to Gullickson through a Stock Purchase Agreement: (1) Illinois DP, LLC a/k/a Dispensary Permits.com ("DP") a consulting business for state-regulated marijuana dispensary or cultivation licenses; and (2) weGrow Enterprises, Inc. ("weGrow") a franchise hydroponic retail operation (collectively, the "Companies").  Stock Agmt, Dkt. No. 36-3.  Gullickson, as consideration, forgave a $10,000 loan to Mann and executed a Promissory Note ("Note") agreeing to pay Mann an additional $400,000 in three installments. Mann alleges Gullickson has failed to make payments as required under the Note.  *See* Note, Dkt. No. 36-6 (included with the Complaint and a "Notice of Default of Promissory Note" sent to Gullickson).

The parties did not spend much time describing the nature of the Companies at issue or the precise nature of their business, but the parties' agreements provide some assistance.  The Stock Agreement indicates weGrow is a franchisor and its franchisees agree to "operate a retail outlet . . . that sells hydroponic and related plant growing equipment and which provides seminars, information and assistance on plant growing techniques (including how to grow cannabis)."  Stock Agmt., Ex. G-1 (attaching "Franchise Disclosure Agreement" of weGrow), available at ECF p.24. The "market" for franchisees' "products and services include "hydroponic farming operations, hydroponic hobbyists, and medical marijuana patients."  *Id.*  This agreement further recognizes that Mann "currently serves as President, the University of Cannabis (www.UniCann.com), the largest online University for medical marijuana in the world" and indicates weGrow also had a "hydroponic retail outlet" that "provides services to assist medical marijuana patients in creating their own cannabis gardens" including by offering "cannabis seminars" and "on-site doctors to recommend cannabis cards and on-site technicians to build [their] customers' grow rooms."  *Id.* at ECF p.25-26.  As to DP, a draft agreement entitled "Dispensary Permits Medical Marijuana Business Plan Development and Consulting Services Agreement" indicates DP's business is to help facilitate the "procurement" of a "medical marijuana dispensary license" for other entities and

---

[1] The following facts are undisputed for summary judgment purposes, unless otherwise noted.

United States District Court
Northern District of California

to those other entities to "apply[] for and prospectively open[] and operate[] a Medical Marijuana Dispensary facility." DP Consulting Agmt. at ECF p.3 & 11, Dkt. No. 36-4. A press release indicates DP was formed "to Assist Entrepreneurs with Opening a Medical Marijuana Dispensary in Illinois" by assisting them with "obtaining a dispensary licenses or cultivation license in Illinois" and providing "hands on support to medical marijuana entrepreneurs." Press Release, Dkt. No. 36-5. There is no indication in the record these Companies directly grew or sold marijuana.

Mann filed this action in California Superior Court on June 4, 2015, which Gullickson removed to this Court on August 7, 2015. Not. of Removal, Dkt. No. 1; *id.*, Ex. A (Compl.). Mann asserts a breach of contract claim, alleging Gullickson defaulted on the Note and requests relief in the form of the alleged remaining principal and other remedies permitted by the parties' contracts, including interest and attorneys' fees. Compl. ¶¶ 7, 9-10. Gullickson filed a cross-complaint on August 7, 2015, asserting claims for breach of contract, breach of the covenant of good faith and fair dealing, conversion, fraud, negligent misrepresentation, and intentional interference with prospective economic relations. Not. of Removal, Ex. C (Cross-Compl.). Gullickson asserts that, in April 2015, at the direction of Mann, the Companies' website manager took the DispensaryPermits.com and weGrowStore.com websites offline, allegedly resulting in substantial missed business opportunities for the Companies. *Id.* ¶ 11.

Gullickson filed this summary judgment motion on July 21, 2016. *See* Mot. She contends the parties' agreement is void *ab initio* because it relates to medical marijuana, which is still a prohibited substance under the federal Controlled Substances Act ("CSA"), even if legal in the states where the Companies operate and the parties' contracts were formed. *See* 21 U.S.C. §§ 841(a), 844(a) (prohibiting the use, distribution, possession, or cultivation of any marijuana). At the hearing on this matter, Gullickson conceded that her counterclaims would be subject to dismissal if the Court granted her summary judgment on the basis asserted in her motion.

Following the hearing, the Court permitted the parties to address three cases that might impact the Court's analysis in this matter: *Bassidji v. Goe*, 413 F.3d 928 (9th Cir. 2005); *Green Earth Wellness Center, LLC v. Atain Specialty Insurance Co.* (*Green Earth*), 163 F. Supp. 3d 821

United States District Court
Northern District of California

1    (D. Colo. 2016); and *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016). The Court also

2    allowed the parties to submit supplemental evidence concerning the nature of the Companies'

3    businesses sold through the parties' agreements and the status of the parties' performance under

4    those agreements. *See* Order, Dkt. No. 42.

5         In a newly-filed declaration, Mann explains the "business of WeGrow [] dba

6    DispensaryPermits.com, was to provide consulting and information services to persons desiring to

7    engage in hydroponic farming" and to "provide consulting and documentation preparation services

8    to persons or entities desiring to establish medical cannabis dispensaries and related businesses in

9    states where such activities were legal." Mann Decl. at 2, Dkt. No. 43-1. He contends that "[a]t

10   no time did these companies possess, cultivate or distribute cannabis plants." *Id.* Instead, he

11   states "[o]ur income was derived solely from the sale of our consulting services and information

12   packs and document preparation." *Id.* Mann contends Gullickson still owes him $225,000, the

13   balance due on the Note and asserts she continues to own and operate the Companies. *Id.* at 3.

14        For her part, Gullickson now declares the "intent of the parties" was that Gullickson would

15   make payments promised under the promissory note "with revenue derived from operating the

16   marijuana businesses" Mann sold her and that Mann "was aware [she] could not pay for the

17   businesses without such businesses generating revenue[.]" Suppl. Gullickson Decl. ¶ 2, Dkt. No.

18   44-1. She explains she "had no other means to pay for the businesses." *Id.* Gullickson also

19   contends she "did not receive what Mann purports to have sold to [her,]" noting that Mann

20   "represented to [her] that the businesses he was selling complied with all applicable laws." *Id.* ¶¶

21   4, 8; *see also* Def.'s Suppl. Reply at 4 (Gullickson "clearly states that she did not get what she

22   paid for") & 4-5 (arguing the "relief requested by Mann cannot be granted because it would

23   'mandate illegal conduct'" as Gullickson has "no other means by which to pay Mann" other than

24   with revenue from the businesses), Dkt. No. 47. Gullickson does not say whether she plans to

25   continue operating the Companies. She contends "[t]here is no evidence in the record that

26   Gullickson knew or should have known of this federal prohibition. The evidence is actually the

27   opposite and undisputed; Gullickson relied on Mann and his attorneys in performing such legal

28   analysis." Def.'s Suppl. Reply at 6; Suppl. Gullickson Decl. ¶¶ 7-8.

United States District Court
Northern District of California

United States District Court
Northern District of California

**LEGAL STANDARD**

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 324-25.

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250. All reasonable inferences must be drawn in the light most favorable to the nonmoving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). However, it is not the task of the Court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The Court "rel[ies] on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010). Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotations omitted).

**DISCUSSION**

**A.      Legality of Medical Marijuana**

California's Compassionate Use Act of 1996 ("CUA"), Cal. Health & Safety Code § 11362.5 (added by Initiative Measure, Prop. 215, as approved by voters on Nov. 5, 1996) gives a person who uses marijuana for medical purposes on a physician's recommendation a defense to certain state criminal charges involving the drug, including possession (Cal. Health & Safety Code §§ 11357 (unauthorized possession), 11362.5(d) (exempting approved patients and primary caregivers)).  In 2004, the state legislature expanded the criminal immunities in the CUA through the Medical Marijuana Program ("MMP") (Cal. Health & Safety Code §§ 11362.7 et seq.). "Among other things, these statutes exempt the 'collective[ ] or cooperative[ ] . . . cultiva[tion]' of medical marijuana by qualified patients and their designated caregivers from prosecution or abatement under specified state criminal and nuisance laws that would otherwise prohibit those activities." *The Kind & Compassionate v. City of Long Beach*, 2 Cal. App. 5th 116, 120 (2016) (quotations omitted; edits in original).

Federal law, however, continues to prohibit marijuana, even by medical users.  *See* 21 U.S.C. §§ 812 (controlled substances), 844(a) (penalties); *Gonzales v. Raich*, 545 U.S. 1, 26-29 (2005) (Congress' plenary power under the Commerce Clause includes the power to prohibit the local cultivation and use of marijuana in compliance with CUA's medicinal use provisions; "The Supremacy Clause unambiguously provides that if there is any conflict between federal and state law, federal law shall prevail."); *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 491-95 (2001) (medical necessity not a defense to manufacturing and distributing marijuana). Marijuana is a schedule-I controlled substance under the CSA.  *See* 21 U.S.C. § 802(6) (defining a controlled substance to include any drug or substance "included in schedule I . . . of part B of this subchapter."); *id.* § 812(c), Schedule I at (c)(10).  "By classifying marijuana as a Schedule I drug, as opposed to listing it on a lesser schedule, the manufacture, distribution, or possession of marijuana became a criminal offense, with the sole exception being use of the drug as part of a Food and Drug Administration preapproved research study."  *Gonzales*, 545 U.S. at 14 (citations omitted).  The first section of the CSA declares that "[t]he illegal importation, manufacture,

distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."  21 U.S.C. § 801(2). California's enactment of CUA and the MMP does not affect the fact that marijuana, including medical marijuana, is prohibited under the CSA.  *See McIntosh*, 833 F.3d at 1176 (reiterating that "the CSA prohibits what the State Medical Marijuana Laws permit"); *see also Ross v. RagingWire Telecomms., Inc.*, 42 Cal. 4th 920, 926 (2008) ("No state law could completely legalize marijuana for medical purposes because the drug remains illegal under federal law" (citations omitted)).

Nevertheless, federal policy regarding enforcement of the CSA has been less than clear since 2009.  *See Green Earth*, 163 F. Supp. 3d at 832 (finding federal government has given "conflicting signals . . . regarding marijuana regulation and enforcement since 2009"); *see also id.* n.7 (collecting, among other things, a memorandum from the United States Attorney General's Office concerning shifting priorities of CSA enforcement efforts for medical marijuana since 2009 in states that regulate medical marijuana use and cultivation); Opp'n at 8 (referencing similar instances demonstrating ambiguous actions by the federal government).  Since that time, courts have grappled with how to resolve conflicts in states that authorized the use of medical marijuana.

In *Tracy v. USAA Casualty Insurance Co.*, the District Court of Hawaii ultimately granted Defendant USAA's summary judgment motion "because the cultivation of marijuana, even for the State-authorized medical use, violates federal law and the enforcement of an insurance policy under the particular circumstances of this case is contrary to public policy[.]"  2012 WL 928186, at *1 (D. Haw. Mar. 16, 2012).  The plaintiff allegedly grew marijuana plants for medical use and when several of these plants were stolen, she attempted to seek coverage as part of her homeowner's insurance policy with USAA, which included coverage for loss to "trees, shrubs, and other plants."  *Id.*  When USAA refused to pay the full amount claims for the loss, the plaintiff sued for breach of contract.  *Id.*  The district court ultimately found that Hawaii law permitted courts to decline enforcing contracts where doing so would require a party to violate federal law, on the ground that such a result would be contrary to public policy.  *Id.* at *10-13.  The court consequently held that "[t]o require Defendant to pay insurance proceeds for the replacement of medical marijuana plants would be contrary to federal law and public policy, as reflected in the

7

1      CSA, *Gonzales*, and its progeny." *Id.* at *13.

2           Federal policy has only become less clear since *Tracy*. As one court in this district

3 recognized, a recent "directive of Congress in Section 538 of the Consolidated and Further

4 Continuing Appropriations Act of 2015, Pub. L. 113-235, 128 Stat. 2130 (2014) ('2015

5 Appropriations Act'),[1] . . . prohibits the Department of Justice [DOJ] from expending any funds

6 in connection with the enforcement of any law that interferes with California's ability to

7 'implement [its] own State law[ ] that authorize[s] the use, distribution, possession, or cultivation

8 of medical marijuana.'" *United States of Am. v. Marin All. for Med. Marijuana*, 139 F. Supp. 3d

9 1039, 1040 (N.D. Cal. 2015), *appeal dismissed* (Apr. 12, 2016) (citing 2015 Appropriations Act

10 § 538; some brackets in original) (interpreting § 538 to preclude enforcement of a permanent

11 injunction prohibiting distribution of medical marijuana by a dispensary to the extent it complied

12 with California law). Even more recently, Congress enacted § 542 of the Consolidated

13 Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2332-33 (2015), which "prohibits

14 DOJ from spending money on actions that prevent the Medical Marijuana States' giving practical

15 effect to their state laws that authorize the use, distribution, possession, or cultivation of medical

16 marijuana." *McIntosh*, 833 F.3d at 1176-78 (holding that "at a minimum, § 542 prohibits DOJ

17 from spending funds from relevant appropriations acts for the prosecution of individuals who

18 engaged in conduct permitted by the State Medical Marijuana Laws and who fully complied with

19 such laws" and "prohibits the Department of Justice from preventing the implementation of the

20 Medical Marijuana States' laws or sets of rules and only those rules that authorize medical

21 marijuana use.").[2]

22           In *Green Earth Wellness Center, LLC v. Atain Specialty Insurance Co.*, a district court

23 addressed a breach of contract claim against this backdrop. 163 F. Supp. 3d at 823. Green Earth

24

25 ――――――――――
[2] Plaintiff argues the DOJ "is prohibited by statute from interfering with the business [Gullickson]
26 purchased from Plaintiff." Opp'n 6. As the Ninth Circuit acknowledged, however, "Congress
could restore funding tomorrow, a year from now, or four years from now, and the government
27 could then prosecute individuals who committed offenses while the government lacked funding."
*McIntosh*, 833 F.3d at 1179 n.5; *see also United States v. Nixon*, No. 16-50097, __ F.3d __, 2016
28 WL 6068201, at *2 (9th Cir. Oct. 17, 2016) ("On its face, the appropriations rider restricts only
the DOJ's ability to use certain funds on particular prosecutions during a specific fiscal year.").

United States District Court
Northern District of California

operated a medical marijuana business, for which Atain provided commercial liability insurance. *Id.* Green Earth made two claims under its policy, both of which Atain denied. *Id.* The first claim was for damage to Green Earth's marijuana plants as a result of a wildfire; the second was for the theft of some of its marijuana plants. *Id.* Green Earth sued Atain for breach of contract, among other things. *Id.* at 824. Atain moved for summary judgment, arguing public policy based on the federal prohibition on marijuana required denying coverage for Green Earth's losses. *Id.* at 826-27. While the court acknowledged *Tracy*, it ultimately declined to follow that case, noting that "the nominal federal prohibition against possession of marijuana conceals a . . . nuanced (and perhaps even erratic) expression of federal Policy." *Id.* at 832, 835. The *Green Earth* court explained that "in light of several additional years [since *Tracy*] evidencing a continued erosion of any clear and consistent federal public policy in this area, . . . . the Court declines Atain's indirect invitation to declare the Policy void on public policy grounds" and found that "Atain, having entered into the Policy of its own will, knowingly and intelligently, is obligated to comply with its terms or pay damages for having breached it." *Id.* at 835. The court consequently denied Atain's summary judgment motion.

To be clear, the Ninth Circuit has recently clearly stated that "[a]nyone in any state who possesses, distributes, or manufactures marijuana for medical or recreational purposes (or attempts or conspires to do so) is committing a federal crime" under the CSA. *McIntosh*, 833 F.3d at 1179 n.5; *see also Nixon*, 2016 WL 6068201, at *2 (citing *McIntosh* for the same proposition). But it is against the foregoing backdrop, with the seemingly "continued erosion of any clear and consistent federal public policy in this area[,]" that the Court must decide whether these contracts are enforceable.

## B.     Framework for Assessing Enforceability of "Illegal" Contracts

Neither party explicitly addressed the choice of law issues associated with this case, but there is no dispute that California law appropriately governs. The parties' Stock Agreement states it shall be governed by and construed under California law (Stock Agreement ¶ 8.1), and the Note likewise states it "will be construed and enforced in accordance with California law, except to the extent that Federal laws pre-empt state law" (Note ¶ 12). In any event, the place of performance

United States District Court
Northern District of California

for these contracts is California, and thus California law properly applies.  *See* Stock Agreement ¶¶ 2.3, 5; Note ¶ 1; *see also Bassidji*, 413 F.3d at 933 (where subject-matter jurisdiction is based on parties' diversity of citizenship, courts apply the choice-of-law principles of the forum state); *Kashani v. Tsann Kuen China Enter. Co.*, 118 Cal. App. 4th 531, 543 (2004) ("When . . . the parties have not designated an applicable law, courts have applied the law of the place of contracting or the place of performance in determining the legality of the contract.").

That said, where a party challenges enforcement of a contract based on the defense of illegality under federal law, there is some question about whether to apply state or federal law. *See Bassidji*, 413 F.3d at 935-36.  The parties did not directly address this dispute in their papers.  Nonetheless, the Court need not conclusively resolve the matter here.  For purposes of ruling on this Motion, the Court is bound by the Ninth Circuit's recognition that "[b]oth federal law and California law begin from the core proposition that whatever flexibility may otherwise exist with regard to the enforcement of 'illegal' contracts, courts will not order a party to a contract to perform an act that is in direct violation of a positive law directive, even if that party has agreed, for consideration, to perform that act." *Id.* at 936.

Under California law, a contract must have a "lawful object."  Cal. Civ. Code § 1550(3). "The object of a contract is the thing which it is agreed, on the part of the party receiving the consideration, to do or not to do." *Id.* § 1595.  Contracts without a lawful object are void. *Id.* § 1598.  California Civil Code section 1668 provides that a contract that has as its object a violation of law is "against the policy of the law."  Civil Code section 1667 elaborates that "unlawful" means: "1. Contrary to an express provision of law; [¶] 2. Contrary to the policy of express law, though not expressly prohibited; or, [¶] 3. Otherwise contrary to good morals." *See also id.* § 1441 ("A condition in a contract, the fulfillment of which is . . . . unlawful . . . is void"). California courts have held that a lawful contract "must not be in conflict either with express statutes or public policy"—as a corollary, "[a] contract that conflicts with an express provision of the law is illegal and the rights thereto cannot be judicially enforced." *Vierra v. Workers' Comp. Appeals Bd.*, 154 Cal. App. 4th 1142, 1148 (2007) (citations omitted); *see also Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 124 (2000) ("If the central purpose of the

1    contract is tainted with illegality, then the contract as a whole cannot be enforced.").

2         "California law includes federal law" and thus, "a violation of federal law is a violation of

3    law for purposes of determining whether or not a contract is unenforceable as contrary to the

4    public policy of California." *Kashani*, 118 Cal. App. 4th at 543 (citing *People ex rel. Happell v.*

5    *Sischo*, 23 Cal. 2d 478, 491 (1943) (federal law is "the supreme law of the land (U.S. Const., art.

6    VI, sec. 2) to the same extent as though expressly written into every state law")).  Gullickson

7    urges the Court to use this rule to void the parties' contracts entirely—but both California courts

8    and the Ninth Circuit have applied a more nuanced approach.

9         In *Kashani v. Tsann Kuen China Enterprise Co.*, a California Court of Appeal affirmed the

10   trial court's grant of summary judgment to the defendants argued that the parties' contract was

11   unenforceable as it was illegal and against public policy because it involved trade and commerce

12   with Iran.  118 Cal. App. 4th at 540.  In doing so, however, the Court of Appeal did not hold that

13   any agreement that involves an illegal contract is necessarily void.  On the contrary, it recognized

14   that "[c]ourts in California have, depending on the facts, carved out exceptions to the statutory and

15   judicial language that illegal contracts are void and unenforceable."  *Id.* at 541-42 (collecting

16   cases).  The court found that "[t]hese authorities give examples of illegal contracts that can be

17   enforced."  *Id.* at 559 n.6.  Moreover, the court recognized that one of the principles courts apply

18   in deciding whether an illegal contract can be enforced is whether a party calls on a court to order

19   another party to carry out an illegal object.  *Id.* at 540 (citing *Wong v. Tenneco, Inc.*, 39 Cal. 3d

20   126, 135 (1985) ("No principle of law is better settled than that a party to an illegal contract

21   cannot come into a court of law and ask to have his illegal objects carried out . . ." (quotations

22   omitted; ellipsis in *Kashani*)); *Lewis & Queen v. N.M. Ball Sons*, 48 Cal. 2d 141, 150 (1957)

23   ("[T]he courts generally will not enforce an illegal bargain or lend their assistance to a party who

24   seeks compensation for an illegal act.")).  The court, however, recognized that "[a]lthough the

25   courts generally will not enforce an illegal contract, in some cases the statute making the conduct

26   illegal, in providing for a fine or administrative discipline, excludes by implication the additional

27   penalty involved in holding the illegal contract unenforceable [citation].  Sometimes the forfeiture

28   resulting from unenforceability is disproportionately harsh considering the nature of the illegality.

United States District Court
Northern District of California

11

1    'In each such case, how the aims of policy can best be achieved depends on *the kinds of illegality*

2    *and the particular facts involved.*'"  *Id.* at 557 (brackets and emphasis in original) (quoting *M.*

3    *Arthur Gensler, Jr., & Assocs., Inc. v. Larry Barrett, Inc.*, 7 Cal. 3d 695, 703 (1972)) (finding in

4    that case that "[e]ven if a determination of enforceability of patently illegal contracts can be based

5    on the particular facts, plaintiffs have not established any basis for departing from the practice of

6    courts generally not to enforce a contract in violation of law.").

7         In another case, the California Supreme Court similarly found that "[i]n compelling cases,

8    illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a

9    disproportionately harsh penalty upon the plaintiff.'"  *Asdourian v. Araj*, 38 Cal. 3d 276, 292

10   (1985) (quoting *Southfield v. Barrett*, 13 Cal. App. 3d 290, 294 (1970)).  The *Asdourian* Court

11   recognized that "'[i]n each case, the extent of enforceability and the kind of remedy granted

12   depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality

13   and the particular facts.'"  *Id.* (quoting *South Tahoe Gas Co. v. Hofmann Land Improvement Co.*,

14   25 Cal. App. 3d 750, 759 (1972)).  While the *Asdourian* Court recognized California adheres to

15   the "well-settled rule that the courts will not aid a party whose claim for relief rests on an illegal

16   transaction[,]" *Wong*, 39 Cal. 3d 126, it found that "[t]his rule is based on the rationale that 'the

17   public importance of discouraging such prohibited transactions outweighs equitable considerations

18   of possible injustice between the parties.'"  *Asdourian*, 38 Cal. 3d at 291 (quoting *Southfield*, 13

19   Cal. App. 3d at 294).

20        In *Bassidji v. Goe*, the Ninth Circuit considered a breach of contract action in which

21   enforcement of the contract would have furthered trade with an Iranian company in contravention

22   of a federal Executive Order.  413 F.3d at 928-39.  The Ninth Circuit analyzed federal case law

23   and California precedents, including *Kashani*, to investigate "[n]uanced approaches to the illegal

24   contract defense, taking into account such considerations as the avoidance of windfalls or

25   forfeitures, deterrence of illegal conduct, and relative moral culpability," and those considerations

26   "remain viable in federal court and represent no departure from [federal precedent] . . . [so] long as

27

28

United States District Court
Northern District of California

1  the relief ordered does not mandate illegal conduct." *Id.* at 937-38.[3]  The Court ultimately

2  concluded that enforcement of the contract would mandate illegal conduct because requiring the

3  defendant to pay the plaintiff "would provide funds to the Iranian economy, paying for goods in

4  Iran[,]" in direct contravention of a federal Executive Order.  *Id.* at 939.  In doing so, the Ninth

5  Circuit indicated when assessing the enforceability of "illegal contracts," courts should consider

6  whether a remedy exists "that would not require a court to order a legal violation."  *Id.*

7         The foregoing case law demonstrates that even where contracts concern illegal objects,

8  where it is possible for a court to enforce a contract in a way that does not require illegal conduct,

9  the court is not barred from according such relief.  However, if, as in *Bassidji*, the enforcement of

10  a contract would require the court to order illegal conduct, such contracts are unenforceable.  This

11  Court must therefore assess whether a remedy exists that would not require it to order a violation

12  of the CSA.

13  **C.     Legality of a Remedy**

14         Gullickson contends the contracts are for "marijuana businesses" and that enforcing the

15  contract "would 'mandate illegal conduct' (the operation of the medical marijuana businesses)"

16  because "she has no other means" to pay Mann other than to operate the businesses.  Def.'s Suppl.

17  Reply at 4-5.  Mann, however, contends the contracts do not "provide or even contemplate that

18  any party to the contract will possess, distribute or cultivate marijuana, medical or otherwise."

19  Pl.'s Suppl. Br. at 2, Dkt. No. 45.  He asserts the contracts "only provide[] for consultation

20  services and providing information" and only in jurisdictions where medical marijuana is legal.

21  *Id.* at 2-3.  At the hearing, Mann's attorney also raised First Amendment concerns, indicating

22  freedom of speech protects the businesses' activities of providing information and consultation

23  services in this field.

---

3 The Ninth Circuit's decision relied heavily on Supreme Court's opinion in *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72 (1982).  As the Ninth Circuit acknowledges, *Kaiser Steel* considered "the difference between cases in which the courts are asked to order an illegal act and cases in which the relief sought does not seek directly to order illegal activity."  *Bassidji*, 413 F.3d at 936 (citing *Kaiser Steel*, 455 U.S. at 79-80); *see Kaiser Steel*, 455 U.S. at 79 (indicating the question was whether Kaiser Steel's promise to contribute "could be enforced without commanding unlawful conduct.").

United States District Court
Northern District of California

13

United States District Court
Northern District of California

Having reviewed the materials in the record, the Court finds it could grant relief in this case that does not require Gullickson to violate the CSA. Mann's suit seeks Gullickson's full payment for the businesses he sold to her. Mandating that payment does not require Gullickson to possess, cultivate, or distribute marijuana, or to in any other way require her to violate the CSA. *Cf. Bassidji*, 413 F.3d at 939 (enforcing contract by forcing defendant to pay the plaintiff would violate the Executive Order because it would "provide funds to the Iranian economy, paying for goods in Iran"). Gullickson attempts to argue otherwise by suggesting "she has no other means" to pay Mann other than to operate the Companies. Def.'s Suppl. Reply at 4. But this argument fails for at least two reasons. First, semantically Gullickson's declaration only says that she "*had* no other means to the pay for the businesses" (Suppl. Gullickson Decl. ¶ 2 (emphasis added))— there is no evidence in the record that she currently *has* no other means to pay for the Companies. Second, even if these businesses are Gullickson's only livelihood, she has not shown the only way to operate them is in a way that violates the CSA. In other words, if the Court ordered payment, and Gullickson's only way to pay was by making these businesses operational, that situation would not necessarily require Gullickson to be involved in the medical marijuana industry; Gullickson has not shown otherwise. Thus, unlike *Bassidji*, ordering payment on the parties' contract would not mandate illegal conduct.[4] *Cf. In re Medpoint Mgmt., LLC*, 528 B.R. 178, 186

---

[4] A fundamental difference between this case and *Bassidji* is that object of the contract here is not *necessarily* illegal. The parties agreed Gullickson would pay Mann to purchase the Companies, which provide "consulting and information services to persons desiring to engage in hydroponic farming" and "consulting and documentation preparation services to persons or entities desiring to establish medical cannabis dispensaries and related businesses in states where such activities were legal." Mann Decl. at 2. There is no evidence in the record that the Companies actually possess, use, cultivate, or distribute marijuana—medical or otherwise.

Moreover, while Gullickson argues the businesses "conspire" to do so (Def.'s Suppl. Reply at 6), this so-called conspiracy is appears to be based entirely on providing information to customers. *See* Opp'n at 9 & 10 ("No authority is presented for the proposition that it is illegal to provide information only concerning medical marijuana"); *see also id.* at 5 (discussing cases concerning potential limitations on aiding-and-abetting theory). In *Conant v. Walters*, the Ninth Circuit affirmed an injunction prohibiting federal officials from revoking a physician's registration, or even investigating a physician's conduct, based on the physician's recommendation that a patient use marijuana. 309 F.3d 629, 639 (9th Cir. 2002) (indicating rejection of government's argument that a doctor's "recommendation" of marijuana encourages illegal conduct by the patient), *cert. denied Walters v. Conant*, 540 U.S. 946 (2003); *see also Thomas v. Collins*, 323 U.S. 516, 535 (1945) (on First Amendment grounds, striking down a statute criminalizing solicitation of union membership without state license because the statute did not distinguish between solicitation and

14

(Bankr. D. Ariz. 2015), *vacated in part on other ground*, 2016 WL 3251581 (B.A.P. 9th Cir. June 3, 2016) ( "[t]he Court will not enter an order for relief which would then result in the appointed chapter 7 trustee necessarily violating federal law (the CSA) in carrying out his or her duties under the [Bankruptcy] Code" where United States Trustee stated there were no legal, non-marijuana assets a trustee could lawfully operate and administer); *Tracy*, 2012 WL 928186, at *13 (declining to order defendant to pay for the replacement of medical marijuana plants).

In a more nuanced approach, Gullickson suggests that if the Court enforces the agreement it would be "condoning and encouraging" illegal conduct.  Def.'s Suppl. Reply at 4-5 ("[I]t is axiomatic that enforcing the contract would flash a green light to any persons concerned about whether they should start helping others cultivate, manufacture, sell and distribute marijuana.  A federal court enforcing these contracts would therefore only encourage commerce related to marijuana.").  But again, the Court finds no merit to this argument.  Enforcing the contract in this case is not endorsing the cultivation, possession, or distribution of marijuana.  It is not making broad pronouncements about that any and all contracts related to marijuana or medical marijuana will be enforceable.[5]  Rather, considering the particular facts and circumstances of this case, the Court finds no reason why the parties' agreement would not be enforceable.

Even if the object of the agreement were illegal, "[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh

---

advocacy and so "put[ ] the speaker . . . wholly at the mercy . . . of his hearers and consequently of whatever inference may be drawn as to his intent and meaning"); *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) ("We need not decide whether the plaintiffs' primary objective . . . would have involved an unlawful act. The mere fact that citizens urge their government to adopt measures that may be unlawful does not deprive the speech involved of its First Amendment protection."). If the government regulated such speech related to medical marijuana, courts would have to consider the "governmental interest at stake" to help "determine whether [such] a restriction on that expression is valid." *Texas v. Johnson*, 491 U.S. 397, 406-07 (1989). The parties did not specifically brief the First Amendment issue, but the Court is not convinced at this point that the object of the parties' contract is necessarily illegal.

[5] The Court is cognizant of the difficulties businesses and individuals in the medical marijuana industry face given the tenuous legal environment surrounding this subject matter; indeed, the typical legal protections may be unavailable to such businesses and individuals in many circumstances. *See* Sam Kamin & Viva R. Moffat, *Trademark Laundering, Useless Patents, and Other Ip Challenges for the Marijuana Industry*, 73 Wash. & Lee L. Rev. 217 (2016) (discussing challenges for businesses operating in the medical marijuana industry.

United States District Court
Northern District of California

penalty upon the plaintiff.'" *Asdourian*, 38 Cal. 3d at 292 (quoting *Southfield*, 13 Cal. App. 3d at 294). Courts also consider "the avoidance of windfalls or forfeitures, deterrence of illegal conduct, and relative moral culpability[.]" *Bassidji*, 413 F.3d at 937-38. Questions of fact remain as to whether Gullickson's avoidance of the agreement would result in her unjust enrichment. There is no dispute that she has not yet paid full amount on the contract. *See* Mann Decl. at 3; Suppl. Gullickson Decl. ¶ 3. Additionally, there is no indication Gullickson plans to abandon these businesses. Rather, Gullickson attests she has spent in excess of $50,000 to rebuild the companies' websites, Suppl. Gullickson Decl. ¶ 5, which could reasonably indicate she plans on maintaining them. Moreover, given the ever-changing political climate concerning medical marijuana—and marijuana in general[6]—as well the federal government's current lack enforcement of the CSA in Medical Marijuana States, the Court cannot ignore the potential likelihood of a windfall for Gullickson if she is able to dodge the contract at this point. A reasonable trier of fact could find Gullickson is likely to be unjustly enriched if the parties' agreement is not enforced.

As to moral culpability, while Gullickson contends she acted without a lawyer and on the advice of Mann's counsel, this does not absolve her of responsibility. As any first year law student is taught, *ignorantia juris non excusat*—"Ignorance of the Law is no excuse." The record here also leaves no doubt that Gullickson knew—or should have known—that marijuana was illegal under federal law. Indeed, the Stock Agreement with its Franchise Disclosure Agreement, which Gullickson repeatedly cites, notes that "the sale of cannabis for medicinal or other purposes is . . . not permitted in the majority of states and or under federal law." *See* Stock Agmt., Ex. G-1 (attaching "Franchise Disclosure Agreement" of weGrow), available at ECF p.25; *see also In re Medpoint*, 528 B.R. at 187 ("Medpoint did not dupe [its creditors] into entering the medical marijuana business. [They] signed various loan or other documents which expressly stated that Medpoint was in the medical marijuana business and that, under federal law, the production, marketing and sale of marijuana was and remains illegal."). A reasonable jury could find that moral culpability lies with both parties.

---

[6] *See, e.g.*, Col. Const. art. XVIII, § 16 (Personal Use and Regulation of Marijuana); *see also* Cal. Prop. 64 ("Marijuana Legalization Initiative" on ballot for 2016 election).

United States District Court
Northern District of California

1   The "deterrence of illegal conduct" factor likewise favors enforcement of the agreement.

2   Gullickson herself disputes whether she received the benefit of the bargain of the parties'

3   agreement, arguing Mann did not perform as required by the contract and induced her into the

4   contract with misrepresentations about the Massachusetts market.  Suppl. Gullickson Decl. ¶ 3;

5   Cross-Compl. ¶¶ 11-12, 15, 20.  If these allegations are true, Mann stands to gain from unlawful

6   conduct.  And the same may be true if Gullickson is permitted to avoid complete payment under

7   the contract.  *See* Opp'n at 10 ("[Gullickson] will have escaped the obligation of paying the

8   Plaintiff $225,000 for the business she purchased" and Mann "will have received only a fraction of

9   the sales price and be left with no remedy to recover the valuable assets he sold.").  While the

10  nature of the businesses may indirectly involve medical marijuana, other potentially illicit conduct

11  would be deterred if the agreement was enforced, i.e., nonpayment for services rendered pursuant

12  to a contract.

13  Finally, as the California Supreme Court acknowledged in *Asdourian*, "'the extent of

14  enforceability . . . depend[s] upon a variety of factors, including the policy of the transgressed law,

15  the kind of illegality and the particular facts.'"  38 Cal. 3d at 292 (quotation omitted).  The federal

16  government's concern over the CSA's medical marijuana prohibition has waned in recent years,

17  and the underlying policy purporting to support this prohibition has been undermined.  *See*

18  *Conant*, 309 F.3d at 641-42 (Kozinski, J., concurring) (discussing uses and benefits of medical

19  marijuana).  Several states and territories have set up systems authorizing and regulating the use,

20  possession, distribution, and cultivation of medical marijuana.  *See McIntosh*, 833 F.3d at 1179 n.3

21  (listing 43 jurisdictions permitting medical marijuana).  As *McIntosh* acknowledges, the federal

22  government is currently proscribed from enforcing the CSA in these jurisdictions, which have

23  independently determined that marijuana has a medical benefit for their citizens.  Indeed,

24  California has found that "seriously ill Californians have the right to obtain and use marijuana for

25  medical purposes where that medical use is deemed appropriate and has been recommended by a

26  physician who has determined that the person's health would benefit from the use of marijuana in

27  the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or

28  any other illness for which marijuana provides relief."  Cal. Health & Safety Code

17

§ 11362.5(b)(1)(A).  Given the federal government's wavering policy on medical marijuana in states that regulate this substance, and California's expressed policy interest in allowing qualified patients to obtain medical marijuana, the purported illegality here is not one the Court finds to mandate non-enforcement of the parties' contract.

## CONCLUSION

Based on the analysis above, the Court hereby **DENIES** Gullickson's Motion for Summary Judgment.  The parties shall meet and confer and file a joint Case Management Statement by November 10, 2016.

**IT IS SO ORDERED.**

Dated: November 2, 2016

_____

MARIA-ELENA JAMES
United States Magistrate Judge